CHICAGO, ROCK ISLAND & PACIFIC RAILWAY COMPANY *v.* THE TITLE GUARANTY & SURETY COMPANY.

Opinion delivered October 12, 1914.

1.  BILLS OF LADING—NEGOTIABILITY—TRANSFER—TITLE.—Bills of lading are made negotiable by statute, and the transfer of a bill of lading operates as a transfer of the title to the personal property which it represents. (Act of March 15, 1887.)

2.  BILLS OF LADING—DELIVERY OF FREIGHT—BOND.—Under act of March 15, 1887, it is a criminal offense for a carrier to deliver goods transported by it without a surrender of the bill of lading therefor, unless the delivery is in response to a bond executed under the authority of the act of May 23, 1907.

3.  CARRIERS—DELIVERY OF FREIGHT—BOND—BILL OF LADING.—The act of May 23, 1907, renders liable the bond of any person who, representing himself to be entitled to the delivery of a consignment of goods, receives a delivery of the same, without surrendering the bill of lading to the carrier, but who delivers to the carrier the bond required by the statute.

4.  CARRIERS—DELIVERY OF FREIGHT—BOND—LIABILITY.—Freight was consigned to shipper's order, and delivered by the carrier to E. Co. upon its bond, and upon its representation that it was entitled to a delivery. The evidence was conflicting as to whether the shipment was not meant for the M. Co., which had no bond, but, *held,* in an action on the bond, under the evidence a question was made for the jury, and that it was error to withdraw the case from the jury.

Appeal from Pulaski Circuit Court, Second Division; *Guy Fulk,* Judge; reversed.

STATEMENT BY THE COURT.

This is an action on a bond given to the Chicago, Rock Island & Pacific Railway Company by the Brook-Rauch Mill & Elevator Company, as principal, and the

Title Guaranty & Surety Company, as surety, to secure deliveries of shipments of goods in advance of a surrender of the bills of lading therefor. The bond was in the penal sum of ten thousand dollars, and its undertaking was that if the railway company would deliver shipments of goods to the elevator company in advance of a surrender of the bills of lading therefor, the obligors would surrender the corresponding bills of lading within thirty days after such deliveries, or would pay to the railway company the value of the goods. The evidence disclosed substantially the following state of facts:

The Brook-Rauch Mill & Elevator Company was organized in August, 1905, with a paid-up capital stock of thirty thousand dollars. R. T. Brook was president and general manager of the company, and owned all the stock except two qualifying shares, of the face value of twenty-five dollars each, held by others. The company did a general grain and elevating business in Little Rock, Arkansas, the volume of which amounted to about half a million dollars a year. It bought large quantities of grain from the Ellwood Grain Company, at St. Joseph, Missouri.

The Brook Milling Company was organized in November, 1910, with a paid-up capital stock of one thousand dollars. R. T. Brook was the president and general manager of this company, and owned all the stock except two qualifying shares, of the face value of twenty-five dollars each, held by others. The company did a grain business in Little Rock, but the volume of business was small compared with that of the Brook-Rauch Mill & Elevator Company.

The elevator company owned a warehouse and elevator on the tracks of the St. Louis, Iron Mountain & Southern Railway Company, with a private industrial track for the delivery of cars intended for it. It had executed the bond sued on to obtain deliveries in advance of the surrender of the appropriate bills of lading. The milling company had no private track, and had not executed such a bond.

On the 19th day of October, 1911, the Ellwood Grain Company received an order by telegram from the milling company for several cars of bulk corn. On the same date it shipped the corn, consigned to itself at Little Rock, with a notation on the bill of lading to notify the milling company; and it drew a separate draft on the latter company for the amount of the invoice of each car of corn, attached each draft to its appropriate bill of lading, and forwarded it to a bank for collection. The drafts were presented before the cars arrived, and payment was refused on that ground. The cars of corn arrived in Little Rock on different dates, the first on October 28, and the last on November 1 or 2. Prior to the arrival of the first car, Brook made several inquiries at the local freight office of the railway company at Little Rock, and was informed that the shipments had not arrived. At the same time he was told that the advices showed that the cars were forwarded to the shipper's order, with instructions to notify the milling company, and he was asked whether the shipments were intended for the milling company, or whether the notation on the bills of lading was simply an error. Brook informed the agent, so the agent testified, that it was evidently an error on the part of the consignor, and that the shipments were intended for the elevator company.

On the 28th of October, the agent at Little Rock inquired by wire of the railway agent at St. Joseph whether the party to be notified should not be the elevator company. The agent at St. Joseph called the Ellwood Grain Company over the telephone and repeated the inquiry. The grain company stated that the party to be notified should be the elevator company. A day or two later the agent asked for written confirmation of this statement, and it was confirmed by the grain company by a letter dated October 31. On October 30, the agent wired the agent at Little Rock that the shipper had advised that it should be the elevator company instead of the milling company.

The last time that Brook inquired about the cars the agent told him that delivery was held up because the cars were consigned to the milling company, and that the railway company would have to have the original bill of lading, properly endorsed, or a written order from him, if he represented the elevator company and wanted the cars delivered to that company. After returning to his office, Brook sent a delivery order to the agent. A *fac simile* of this order appears in the record. The agent testified that he thought it was an order from the elevator company. The signature is not plain, but a careful examination shows that it is "Brook Mill Company, R. T. Brook." In this connection the testimony of the agent was as follows:

"If the cars were shipper's order cars, consigned to the Brook-Rauch Mill & Elevator Company, I would make straight delivery to the Iron Mountain before the bill of lading was surrendered at all, but if they came consigned to the Brook Milling Company, I would hold them up, for the reason that I did not know the Brook Milling Company, and for the further reason that the Brook-Rauch Mill & Elevator Company had a bond. The Brook Milling Company had no bond. I told Mr. Brook that we were holding up these cars because they were to notify Brook Milling Company. The first thing I asked him, did he represent the Brook Milling Company, and he said he did; in fact, he said it was all the same, and it was just an error in the bill of lading. He said he was positive that it was an error on the part of the railroad agent at St. Joe, or that the shipper had made an error, and that it was intended to be Brook-Rauch Mill & Elevator Company. Any way, he represented who it was billed to, and the cars belonged to him. After his assurance that this was simply an error, and that the delivery was to be made to the Brook-Rauch Mill & Elevator Company, he gave us that order to deliver them, and I immediately ordered the cars over. The order here shown me is the order he gave."

R. T. Brook testified that in ordering the cars set on the track and at the elevator of the elevator company, he was acting as the president of the milling company, and that the delivery was to the latter company though on the track of the former. He further testified that immediately upon such delivery, the milling company sold the corn to the J. F. Weinmann Milling Company, a corporation organized a few days prior to the transaction for the express purpose of taking over the business of the elevator company. The stock of the new concern was owned as follows: R. T. Brook, eighty shares, J. F. Weinmann, one hundred and fifty shares, and J. A. Weinmann, ten shares.

After the drafts on the milling company were protested and returned with the bills of lading attached, and after the communications between the grain company and the railway agent at St. Joseph, the grain company endorsed an order on the bills of lading to deliver to the elevator company, and drew drafts on that company for the purchase price of the four cars of corn and sent the drafts with the bills of lading attached to a bank in Little Rock for collection. The drafts were duly presented, but payment was refused. The railway company then paid the consignor the value of the corn, and brought suit on the bond.

At the conclusion of the testimony, the court directed the jury to find for the defendants.

*Thos. S. Buzbee* and *John T. Hicks,* for appellant.

*Chamberlin & Townsend,* for appellees.

COLEMAN, Special Judge, (after stating the facts). (1-2) Bills of lading are made negotiable by statute, and the transfer of a bill of lading operates as a transfer of the title to the personal property which it represents. (Act of March 15, 1887.) Under this statute, it is a criminal offense for a carrier to deliver goods transported by it without a surrender of the bill of lading therefor, unless the delivery is in response to a bond executed under

the authority of the act of May 23, 1907. That act provides as follows:

"It shall be lawful for a shipper or consignee of goods to make, execute and deliver to, and the carrier to take and receive, a good, sufficient and valid bond in a sum double the value of the goods, conditioned that the shipper or consignee shall, within a reasonable time thereafter, deliver to the carrier the original receipts and bills of lading issued for said goods, or shall pay the value of said goods to the carrier upon demand; and upon the execution and delivery of said good, sufficient and valid bond as aforesaid, it shall be lawful for the carrier to deliver up the said goods to the shipper or consignee, without requiring the immediate surrender of said original bills of lading and receipts, and for so doing the carrier shall not incur the penalty of the law as set forth in chapter XV of Kirby's Digest."

It is argued that as the act of March 15, 1887, made it a crime for a carrier to deliver goods without a surrender of the bill of lading therefor, the act of May 23, 1907, merely creates an exception in favor of shippers and consignees; and a person who is not a shipper or a consignee would not be authorized to give a bond, and a delivery to such a person would be a criminal offense. And the appellees contend in this case, first, that the corn was delivered to the milling company, and not to the elevator company, the principal in the bond sued on; and, second, that even if the delivery had been to the elevator company, a bond given to induce such delivery would be void, because that company was neither the shipper nor the consignee within the purview of the statute. In support of the latter contention it is insisted that as the corn was shipped to the shipper's order, and the bill of lading was attached to a draft on the elevator company for the purchase price, the elevator company could only have become the consignee of the shipment by paying the draft and taking up the bill of lading, and this it refused to do.

In *St. Louis, I. M. & S. Ry. Co.* v. *Bankers Surety Co.,* in which the opinion has just been handed down, it

was held that the association of the words *shipper* and *consignee* in the act of May 23, 1907, in connection with the context of the act, clearly indicated that those terms were used as complements of each other, and that they were intended to embrace all the parties with whom a carrier has to deal in the receipt and delivery of goods transported by it. It was further held that the word *consignee* does not imply ownership or title, and that, as used in the statute, it means a person who, under circumstances in which he might be entitled to a delivery of goods, represents to the carrier that he is so entitled, and tenders a bond in the statutory form and requests a delivery.

In arriving at its conclusion in the case just referred to, the court was influenced to a certain extent by the conviction that the construction which it approved was the only construction that would give any real effect to the act. It was thought that the construction contended for by the appellees in the present case would render the act useless, for the statute, if construed as they insist it should be construed, would condition the validity of a bond purporting to have been executed under its authority on the legal right of the principal to receive the goods, and bonds would be valid in those cases only in which their protection would never be needed, and invalid in those cases only in which it would be needed. Such a construction should not be adopted unless imperatively demanded, for it is hard to believe that the Legislature intended that the ultimate necessity for the protection of the bond should be the very fact which would determine the want of statutory authority to execute it.

It may be urged that the strict letter of the statute limits its application to persons legally entitled to the delivery of goods, and that the only object of the act was to compel a surrender of the bills of lading. But such a construction would attach greater importance to the mere evidence of a right than to the right itself. The bill of lading is the documentary evidence of the legal right of the holder to a delivery of the property which it repre-

sents. When a delivery is made to that person, the bill of lading becomes *functus officio,* except that it may constitute a record in the hands of the carrier of the fact that delivery was made to the person entitled to it. It is important that such a record should be preserved, but it is far more important that the delivery should have been made to the right person. And when the statute provides that the principal in the bond shall pay the value of the goods if he shall fail to surrender the bill of lading for them, it indicates very convincingly that the legislative purpose was not so much to preserve the memorials of rightful deliveries, as it was to provide indemnities for wrongful deliveries, by requiring false claimants to pay the value of the goods which they have illegally obtained.

(3) It follows from the foregoing that the bond in this case was authorized by the statute, and that it covered the delivery of the corn to the elevator company, if the delivery was really made to that company. That issue raises a question of fact.

While there is a conflict in the testimony, the jury would have been warranted in finding that the delivery was to the elevator company, and not to the milling company. It is true that the corn was ordered by the milling company, but there is evidence to the effect that this company was unknown both to the consignor and to the railway company, and that the former notified the latter that the shipment was intended for the elevator company, and authorized a substitution of that company for the milling company. It is admitted that the milling company had not furnished a bond to the railway company, while the elevator company had; and there is testimony tending to show that Brook, who was the sole owner of both companies, and the president and general manager of each, when he was told that the advices named the milling company, and that a delivery would not be made to that company without a surrender of the bills of lading, as it had not executed a bond, replied that the billing was evidently a mistake on the part of the consignor, and that the corn was really intended for the elevator company. It further

appears that the milling company refused to pay the drafts drawn on it for the price of the corn, and that these drafts were recalled by the consignor, who drew new drafts on the elevator company, and sent them with the bills of lading attached to a bank for collection. The cars were actually set on the elevator company's private track, at its warehouse, at Brook's request; but he testified that he was acting for the milling company, and that he signed its name to the written order which he gave for setting the cars. The local agent testified that the cars were delivered to the elevator company, under its bond, and that he had refused to deliver to the milling company. He says that the signature to the order was written in such a manner that he mistook it for the signature of the elevator company. The latter company, like the milling company, refused to honor the drafts for the price of the corn, and the railway company paid the value of the corn to the consignor, on its demand.

(4) If the railway company, in having the cars set on the private industrial track of the elevator company, intended to deliver the corn to that company, for the use of that company, and did not intend to deliver it to the milling company, or to deliver it to the elevator company for the use of the milling company, and such delivery was made at the request of a duly authorized agent of the elevator company, and was induced by a representation by such agent that the shipment was intended for it, and that it was entitled to delivery, and the railway company acted in good faith in making such delivery, then the delivery was within the terms of the bond, and the bond is liable accordingly, even though it may have subsequently developed that the elevator company was not legally entitled to have the corn delivered to it.

The cause should have been submitted to the jury on the issue of fact raised by the evidence. For the error of the court in peremptorily instructing the jury to find for the defendants, the judgment is reversed, and the cause is remanded for a new trial.

McCULLOCH, C. J., dissenting.